# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

THERESE C. COURTNEY,                    :

     Plaintiff,                          :
                           Case No. 3:12cv00329

vs.                                     :
                           District Judge Thomas M. Rose

CAROLYN W. COLVIN,                      :    Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,                :

     Defendant.                          :

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Therese C. Courtney suffers from multiple sclerosis, asthma, allergies, arthritis, and depression.  (*PageID#* 276).  Her impairments adversely impact her ability to engage in basic work activity, and prevent her from performing her past work as a cafeteria worker, inventory control worker, and receptionist.  (*PageID#* 277).  She consequently sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ("DIB") on December 3, 2007, and Supplemental Security Income ("SSI") on October 31, 2008, alleging disability beginning August 13, 2007.  (*PageID##* 236-45, 246-52).

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

After various administrative proceedings, Administrative Law Judge ("ALJ") Peter B. Silvain denied Plaintiff's applications for disability benefits based on his conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act.  (*PageID##* 81-94).  The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. §§ 405(g), 1383(c)(3), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. # 10), the administrative record (Doc. # 6), and the record as a whole.

## II.    BACKGROUND

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 43 years old on the alleged disability onset date, which defined her as a "younger individual" for purposes of resolving her DIB and SSI claims.  *See* 20 C.F.R. §§ 404.1563(c); 416.963(c)[2]; *see also PageID##* 93, 271.  Plaintiff has a high school education.  (*PageID#* 283).

Plaintiff testified that after she stopped working in September 2007, she became extremely depressed, felt useless, and was frustrated.  As a result, in 2008, she started working for 5 hours per week (on Saturdays) at a restaurant owned by an extended family

---

[2]The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI/DIB Regulations.

member.  Plaintiff further explained that the restaurant "is kind of like your Cheers type establishment.  The same people come in.  If I screw up their order they laugh, and say it's okay . . . ."[3]  (*PageID*## 112-13).  At the time of the hearing, Plaintiff was working 11 hours a week.  (*PageID*# 114).  She is permitted to sit down or leave early whenever she needs.  (*PageID*## 114-15).

She testified that she had lost weight due to her use of the medication Topamax. (*PageID*# 116).  She lives alone in a trailer, and walks up four steps while holding a rail to enter her home.  (*PageID*# 117).  She has a driver's license and drives to the family restaurant.  (*Id.*).  After being diagnosed with multiple sclerosis, she tried to take classes at the local community college.  She found it very difficult and frustrating to understand the course material and was not able to complete assignments on time.  As a result, she received a disability accommodation and completed her course work on the Internet. (*PageID*## 118-19).

Plaintiff feels she is disabled due to fatigue, flare-ups of her hormonal cycle every three or four weeks, and flare-ups of trigeminal neuralgia four or five days a month. (*PageID*# 124).  She described her symptoms as progressive.  She notes that, initially, she will notice pain in her cheek, then as her cycle nears she becomes increasingly fatigued.

_____

[3] Plaintiff is referring to the popular television series, "Cheers," which ran from 1982 through 1993, starring Ted Danson, Rhea Perlman, and John Ratzenberger, about a bar in Boston where the regulars "share their experiences and lives with each other while drinking or working at the bar where everybody knows your name."  Internet Movie Database, www.imdb.com/title/tt0083399/?ref_=fn_al_tt_1 (last visited Nov. 8, 2013).

She explained that she will sleep or lay down for 16-18 hours a day; her right leg starts to spasm; her left arm will feel numb or burning; and her left cheek pain intensifies to sharp/jabbing pain causing mouth pain.  She testified that all her teeth hurt, and her temple and eye also throb.  (*PageID## 124-26*).  She rated her facial and cheek pain from a 3 to 6 out of 10, and teeth pain from 7 to 8 out of 10.  (*PageID# 125*).

Plaintiff testified that she had a flare-up of multiple sclerosis when she went off birth control pills.  (*PageID# 126*).  She stated that she had a relapse of multiple sclerosis in the summer of 2009 and no other relapses since August 2007.  (*PageID# 129*).  She testified on May 24, 2010.  (*PageID# 109*).

Plaintiff also discussed her asthma, stating the attacks are slowing down as she is in a more controlled environment in her home and is not outside.  (*PageID## 127-28*).  In her past job she had asthma attacks two or three times a week at work, as well as two or three attacks a week at home.  (*PageID# 128*).  Presently, she uses a nebulizer about once a month now, whereas she used to use one twice a day.  (*Id.*).

Plaintiff was also asked about her arthritis.  She stated that her arthritis "has been creeping up for a long time."  (*PageID# 128*).  She said that she left a cooking job at a high school due to arthritis in her back.  (*Id.*).  At the time of the hearing, arthritis in her knees was worse than in her back and neck.  (*PageID# 129*).

Plaintiff described how she must pace herself, doing "everything in shifts."  (*PageID# 130*).  She tries to clean her own house, but must lie down after vacuuming a rug.  She explained it can take two days to do a load of laundry.  (*Id.*).

4

Plaintiff estimated that she can sit for a maximum of an hour before she has to move. (*PageID#* 130).  She also estimated she can only stand a maximum of one hour. (*PageID#* 131).  She can walk one block before resting.  (*Id.*).  She can lift a gallon of milk with either hand.  (*Id.*).

On a typical day, Plaintiff gets up around 9:00 a.m., loads the dishwasher, makes coffee, takes her medication, loads clothes in the washer, drinks coffee, and goes back to bed.  (*PageID#* 131).  Her only meal is dinner, and this meal may consist of simply frozen food.  (*PageID#* 132).   In the afternoon, she takes a nap for two hours.  (*Id.*).  She runs the vacuum, and watches television before going to bed at 9:00 p.m.  (*Id.*).  She only goes to the grocery twice a month.  (*Id.*).  She tries to do chores daily, unless she is having a bad day.  (*PageID#* 133).  Her boyfriend takes out the garbage.  (*Id.*).  Her boyfriend visits her four times a week and does the yard work and snow removal for her.  (*Id.*).  She has a cell phone and uses the computer to play games of solitaire.  (*Id.*).  She said that she dropped out of all organized clubs.  (*PageID#* 134).  She has stopped visiting others. (*Id.*).  Her hobbies include "little projects" such as learning to do upholstery.  (*Id.*).  She stated that she wants to accomplish something, but she gets little completed due to her health.  (*Id.*).

When cross-examined by her counsel, Plaintiff reported numbness in her left hand and arm that makes it difficult for her to open jars.  (*PageID##* 135-36).  She avoids carrying very much.  (*PageID#* 136).

5

B.     **Relevant Medical Opinions**[4]

Plaintiff first manifested symptoms of multiple sclerosis in June 2004. Her symptoms included altered sensation on the left side of her face, vertigo, and "episodic incapacity."  (*PageID*## 356, 364, 459, 663).

By January 19, 2007, Plaintiff was seen at Cleveland Clinic for a multiple sclerosis evaluation. (*PageID*## 356-74).  Plaintiff presented with atypical face pain, which occurred every 3 weeks, as well as vertigo, fatigue, and increasing cognitive symptoms. (*PageID*# 364).  On examination, Plaintiff had a drift to the left when walking. (*PageID*## 358-59).  An MRI of the brain showed an increase in the number of lesions when compared to brain MRI's taken in February 2005 and February 2006.  (*PageID*## 356-57).  Plaintiff was assessed to have multiple sclerosis, and it was recommended she start disease modifying therapy with Avonex.  (*PageID*# 359).

Plaintiff relies on the opinions of her treating neurologist, Lawrence P. Goldstick, M.D., who initially saw her on March 20, 2007.  (*PageID*## 406-08).  After reviewing her history and examining Plaintiff, Dr. Goldstick found that Plaintiff's episodes of neurological dysfunction have been separated in time.  Because of the distinct episodes, and the increase of brain lesions within the last year, Dr. Goldstick found that Plaintiff's illness was "highly suspicious for demyelinating disease and relapsing remitting MS." (*PageID*# 408).  Dr. Goldstick completed a "Certification of Health Care Provider,"

---

[4]The record contains a number of medical reports and correspondence from physicians and psychiatrists who treated Plaintiff for physical and mental ailments not at issue in this case.  Such records are, accordingly, not summarized herein.

noting that Plaintiff has a degenerative demyelinating progressive disease. He found that Plaintiff could still work at that time, but would likely need 2 to 3 days off per month for the next 8 months. Dr. Goldstick completed the form on March 20, 2007. (*PageID##* 730-31).

An MRI taken of Plaintiff's brain on August 23, 2007, revealed multiple lesions, primarily in gray-white matter junction, bilaterally, and numbering 12 to 14. (*PageID#* 386).

In September 2007, Dr. Goldstick completed a "Sickness Claim Form" for AFLAC, reporting that Plaintiff was working full-time and that he released her to return to work. (*PageID#* 744).

By November 2007, however, Dr. Goldstick noted that Plaintiff's demyelinating disease has been exacerbating with "incapacitating" facial pain and trigeminal neuralgia. (*PageID#* 405). On December 20, 2007, Dr. Goldstick reported that Plaintiff had developed a tremor in her head, left arm, and left leg; left leg numbness/tingling; left leg fatigue; and increasing memory/cognitive impairments. (*PageID##* 403-04).

On January 16, 2008, Dr. Goldstick noted the following regarding Plaintiff: "[she] has had multiple symptoms including stress related issues, depression, anxiety, left facial pain, neuralgic pain, numbness and tingling involving the lower extremities, and concentration difficulties as well as attention problems. She has had tremors at times that have been related to anxiety and hyperventilation as well as panic attacks. I feel that the patient is unable to work at this time due to the combination of multiple issues including

demyelinating disease and the fact that she has a chronic progressive disease. She also has concentration and memory difficulties relating to her multiple medications that are used for both her demyelinating disease, trigeminal neuralgia, depression, and anxiety. I feel that she is unable to work in her previous capacity." (*PageID#* 426.)

A July 28, 2008 MRI of the brain showed a "slight increase in the number of lesions," since the August 23, 2007 study. (*PageID#* 775).

Dr. Goldstick completed a Basic Medical form on behalf of the Department of Job and Family Services on July 23, 2008. (*PageID##* 954-56). Plaintiff's diagnoses consisted of multiple sclerosis, relapsing and remitting; trigeminal neuralgia; depression; and anxiety. (*PageID#* 955). Her symptoms include fatigue; weakness; lower extremity tingling and numbness; left-sided face pain; left arm numbness; and deficits in concentration, memory, and attention. (*Id.*). Dr. Goldsmith found that Plaintiff's ability to use her left arm for reaching and handling was markedly impaired. He concluded that during a relapse she could not perform work of any kind. When stable, she should be able to perform part-time sedentary work for only 10-15 hours a week. (*PageID#* 956).

A July 2009 brain MRI showed a stable imaging appearance of multifocal and nonenhancing subcortical T2 hyperintensities with predilection for frontoparietal localization since July 28, 2008; based imaging appearance and localization, specificity of these lesions for multiple sclerosis is low; and no evidence of acute intracranial pathology. (*PageID##* 969-70).

8

In September 2009, Dr. Goldstick completed another Basic Medical form. (*PageID*## 951-53).  Dr. Goldstick limited Plaintiff to working an 11-hour work week in a sedentary job.  As previously noted, if Plaintiff was experiencing a relapse of her multiple sclerosis, Dr. Goldstick again determined she would be unable to perform any work.  (*PageID*# 953).

On April 21, 2010, Dr. Goldstick completed a functional capacity questionnaire on Plaintiff's behalf.  (*PageID*## 987-92).  Dr. Goldstick opined that Plaintiff is severely impaired in her ability to achieve goals and respond to time limits; perform routine repetitive tasks independently; sustain attention; tolerate regular work-related stress; maintain production standards; and be prompt and regular in attendance.  (*PageID*## 988-89).  Dr. Goldstick found Plaintiff's prognosis was good/stable with treatment. (*PageID*# 989).  Dr. Goldstick noted medications caused sedation, ataxia, decreased concentration, cognitive difficulty and "prevent [her] ability to perform activities necessary to perform a job and maintain adequate attendance."  (*PageID*# 990). According to Dr. Goldstick, Plaintiff could stand or walk no more than four hours total, and is not able to perform repetitive grasping, pushing, pulling, fine manipulation or repetitive foot controls.  (*PageID*# 991).

On April 27, 2010, Dr. Goldstick prepared a narrative noting that since August 2007, Plaintiff "has had recurrent and persistent facial pain involving the left face and difficulty with ambulation, balance, and two paresthesias involving the upper and lower extremities, she cannot perform substantial gainful activity and competitive work because

of difficulty with fatigue, paresthesias, dysesthesias, and unsteadiness as well as facial

pain that is incapacitating and does not allow her to concentrate or perform activities

relating to skilled activities and does not allow her to handle stresses and pressures or

interactions with people or superiors on a daily basis." (*PageID#* 339).  He believed that

Plaintiff had been "indefinitely disabled," even with optimal treatment, because of her

persistent symptomatic abnormalities, including facial pain, ataxia, fatigue, and

paresthesias in the upper and lower extremities.  Objective findings for demyelinating

disease have included a MRI that demonstrates white matter disease, and a clinical course

has been consistent with the diagnosis.  (*PageID#* 339).

On June 4, 2010, Dr. Goldstick prepared a narrative response to testimony from

the medical expert, Dr. Goren.  Dr. Goldstick reported that Plaintiff's multiple sclerosis is

documented through MRI data, as well as clinical relapses and episodes of increased

facial pain. She has required a number of pain medications, and medicines for increased

tone in the lower extremities that have caused concentration difficulties, cognitive issues,

and sedation to the point that it makes her unable to work in a situation that would require

daily attendance and in a situation that would require working for 8 hours per day.  Her

ability to interact with individuals is also significantly compromised because of the

multiple medications she takes, and because of her excessive fatigue (a major issue and a

major symptom complex with her demyelinating disease and multiple sclerosis).  This

prevents her from being able to work an 8 hour workday, and prevents her from being

able to engage in gainful employment.

Plaintiff's most significant problems include persistent facial pain (which interferes with her ability to work and is very distracting for her), as well as excessive fatigue (which is very commonly seen as the most significant symptom complex in demyelinating disease and multiple sclerosis).  Due to these issues, Dr. Goldstick concluded that Plaintiff could not work and is disabled.

Dr. Goldstick opined that although Plaintiff's examinations have, at times, been within normal range, he nonetheless concluded that Plaintiff is unable to work because of the numerous symptoms she experiences, including significant fatigue and concentration difficulties.  (*PageID#* 994-95).

C. **Medical Expert Testimony**

Hershel Goren, M.D., testified as a medical expert during the administrative hearing.  (*PageID##* 138-51).  Dr. Goren thought that Plaintiff's impairments included multiple sclerosis under Listing 11.09; left shoulder supraspinatus tendon tear, under Listing 1.02; and asthma, under Listing 3.03.  (*PageID#* 139).  Dr. Goren did not believe that Plaintiff's conditions met or medically equaled any Listing, but he concluded that she would require work restrictions.  (*PageID#* 140).  Dr. Goren also testified that, based on his review of the record, he believed Plaintiff retained the ability to lift or carry 20 pounds occasionally and 10 pounds frequently; could occasionally perform left shoulder overhead pushing, pulling or reaching; and should not be exposed to extreme heat or concentrated fumes.  (*Id.*).

11

When asked about the neurological condition, trigeminal neuralgia, Dr. Goren dismissed the possibility that Plaintiff has it.  Dr. Goren opined that "Trigeminal Neuralgia is a disease of senior citizens, almost always age 60." (*PageID##* 140-41).  He continued to explain that Plaintiff's ache/pain problems are typical symptoms of multiple sclerosis, and not the pain of trigeminal neuralgia. (*PageID#* 141).

Dr. Goren disagreed with "all of the conclusory records" in evidence, including Dr. Goldstick's assessments from January 16, 2008, September 11, 2009, and April 21, 2010, as well as the opinions of Drs. Dueno and Vyas.  (*PageID##* 141-42).  Dr. Goren did not believe that the reports were supported by the "evidentiary records, the physician filling out the form or any other physician in the record." (*PageID#* 142).

On cross-examination by Plaintiff's counsel, Dr. Goren testified that he has treated "hundreds" of patients with multiple sclerosis.  (*Id.*).  Dr. Goren believed that there is a conflict between the severity of the impairments described by Dr. Goldstick and the severity of the clinical findings described in the record.  (*PageID#* 144).  For example, Dr. Goren believed that if, as concluded by Dr. Goldstick, Plaintiff could never used hand or foot controls, or handle or finger objects, then she would be unable to feed herself. Plaintiff's counsel, however, asked Dr. Goren to turn to Exhibit 99F, and noted that "Dr. Goldstick is saying . . . [Plaintiff] cannot use her hands for repetitive grasping, pushing, pulling, fine manipulation on *a sustained basis in an eight-hour day*." (*PageID#* 145)(emphasis added).  Plaintiff's counsel next asked Dr. Goren, "You don't really have to feed yourself for eight hours a day, do you?" (*Id.*).  Dr. Goren responded that "feeding

12

onself requires repetitive movements of the hands, but one does not feed oneself for eight hours a day." (*PageID#* 146).  Nonetheless, Dr. Goren maintained his position that Dr. Goldstick's finding was inconsistent.  (*Id.*).

Dr. Goren did not deny that Plaintiff had some pain and symptoms, but asserted that such symptoms are subjective.  (*PageID#* 150).  Dr. Goren acknowledged that the records do not show Plaintiff was a malingerer, but that the psychological testing in February 2009 was consistent with somatization.  (*Id.*).

### D.    <u>Vocational Expert Testimony</u>

A vocational expert ("VE"), Suman Srinivasan, also testified at the administrative hearing.  (*PageID##* 151-60).  The VE testified that Plaintiff's past relevant employment as a cafeteria counter attendant, was performed at the unskilled, light exertional level, and her employment as an inventory clerk, was performed at the semi-skilled, medium exertional level.  (*PageID#* 154).

The ALJ set forth a series of hypotheticals to the VE regarding Plaintiff's residual functional capacity ("RFC")[5].  The ALJ asked the VE if Plaintiff could perform work with the following requirements: an allowance for alternation of sitting or standing positions at 30-minute intervals throughout the day; occasional pushing/pulling; occasional operation of foot controls; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs, stooping, kneeling, crouching, or crawling;

---

[5]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. § 404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

occasional overhead reaching on the left side; avoidance of moderate exposure to extreme cold or heat, wetness, or humidity; avoidance of all exposure to irritants such as fumes, odors, dust, gases, and poorly ventilated areas; avoidance of all exposure to hazardous machinery and unprotected heights; low stress work (defined as having no fixed production quotas, no hazardous conditions) and with only occasional decision making and occasional changes in the work setting; and only occasional interaction with co-workers and public and no tandem tasks.  (*PageID*## 154-57).  Based on this series of hypotheticals, the VE acknowledged that Plaintiff could not perform her past relevant work, but that other light, unskilled jobs would remain available in the region, such as a mail sorter and garment folder (with approximately 8,000 jobs available).  (*PageID#* 157).

The VE next testified that she believed her testimony was consistent with the *Dictionary of Occupational Titles* ("DOT"), with the exception of the need to alternate sitting and standing.  (*PageID#* 158).

When cross-examined by Plaintiff's counsel, the VE acknowledged that all of the jobs that she testified to in response to the ALJ's hypothetical questions are full-time; require a person to perform repetitive tasks independently; require an individual to maintain attention to achieve specific goals; and must be performed in a consistent manner.  (*PageID*## 158-60).  The VE testified that an acceptable rate of absenteeism would be 1 to 1 ½ days per month.  (*PageID#* 160).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined

To be eligible for SSI or DIB a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §§ 423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both DIB and SSI.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job, and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70 (1986).

A DIB/SSI applicant bears the ultimate burden of establishing that he or she is under a disability.  *See Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

### B.    Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See PageID##* 82-83; *see also* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1.    Has the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

15

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity, can he perform his past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.      ALJ Silvain's Decision**

ALJ Silvain's pertinent findings began at Step 2 of the sequential evaluation where he concluded that Plaintiff has the severe impairments of: 1) multiple sclerosis; 2) trigeminal neuralgia; 3) cervical degenerative disc disease; 4) left shoulder tendon tear; 5) arthritis; 6) lumbar bulging discs; 7) vertigo/ataxia/tremor; and 8) depressive disorder, NOS (not otherwise specified).  (*PageID#* 85).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.  (*PageID#* 87).

At Step 4 the ALJ concluded that Plaintiff retained the RFC to perform light work[6] featuring: 1) an allowance for alternation of sitting or standing positions at 30-minute intervals throughout the day; 2) occasional pushing/pulling; 3) occasional operation of

---

[6] The Regulations define light work as involving the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds..." 20 C.F.R. § 404.1567(b).

16

foot controls; 4) no climbing of ladders, ropes, or scaffolds; 5) occasional climbing of

ramps or stairs, stooping, kneeling, crouching, or crawling; 6) occasional overhead

reaching on the left side; 7) avoidance of moderate exposure to extreme cold or heat,

wetness, or humidity; 8) avoidance of all exposure to irritants such as fumes, odors, dust,

gases, and poorly ventilated areas; 9) avoidance of all exposure to hazardous machinery

and unprotected heights; 10) low stress work (defined as having no fixed production

quotas, no hazardous conditions) and with only occasional decision making and

occasional changes in the work setting; and 11) only occasional interaction with

co-workers and public and no tandem tasks.  (*PageID*## 88-89).

The ALJ concluded at Step 4 that Plaintiff was unable to perform any of her past

relevant work.  *(PageID*## 92-93).

At Step 5, the ALJ considered section 202.21 of the Grid[7], coupled with the VE's

testimony, and Plaintiff's age, education, work experience, and RFC, and found there are

jobs that exist in significant numbers in the national economy that Plaintiff can perform.

*(PageID*## 93-94).

The ALJ's findings throughout his sequential evaluation led him to ultimately

conclude that Plaintiff was not under a disability, and was therefore not eligible for DIB

or SSI.  (*PageID*# 94).

## IV.  JUDICIAL REVIEW

---

[7] *See* Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2.

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

18

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    <u>Plaintiff's Contentions</u>

Plaintiff contends that the ALJ erred in his evaluation of treating neurologist, Dr. Goldstick's opinions.  (Doc. #7, *PageID#* 1010).  According to Plaintiff, the ALJ erred by crediting the opinion of the medical expert, Dr. Goren, over the opinion of Dr. Goldstick. Plaintiff emphasizes that "[t]he ALJ's reliance on Dr. Goren's telephonic testimony is particularly worrisome, as the doctor did not seem to understand the concept of RFC for Social Security disability analysis."  (*Id.*, *PageID#* 1015).  Plaintiff also argues that while Dr. Goldstick actually treated and examined Plaintiff, Dr. Goren did not even see Plaintiff at the administrative hearing because he testified via telephone.  (*Id.*, *PageID#* 1013). Plaintiff argues Dr. Goldstick's opinions were supported by his treatment notes, as well as the opinions of other treating sources, Drs. Dueno and Vyas.  (*Id.*, *PageID#* 1014). Plaintiff also contends the ALJ erred in assessing her credibility.  (*Id.*, *PageID#* 1016).

The Commissioner argues that the opinion of Dr. Goldstick was not entitled to controlling or deferential weight, and the ALJ properly weighed this opinion as Social Security Regulations and Rules required.  According to the Commissioner, substantial evidence supports the ALJ's decision, particularly, his reliance upon Dr. Goren's testimony when assessing Plaintiff's residual functional capacity.  (Doc.# 9, *PageID##* 1026-34).

B.     **The Opinion of the Treating Physician**

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365 (6th Cir. 2013).

Generally, "the opinions of treating physicians are entitled to controlling weight." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997)).  However, '[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley*, 582 F.3d at 406 (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996)).  In *Wilson*, the Sixth Circuit noted that a treating physician's opinion can be discounted if: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques; (2) it is inconsistent with substantial evidence in the record; (3) it does not identify the evidence supporting its finding; and (4) it fares poorly when applying the factors listed in 20 C.F.R. § 404.1527(d)(2), which include, *inter alia*, the

20

length and frequency of examinations, the amount of evidence used to support an opinion, the specialization of the physician, and consistency with the record.  *Wilson*, 378 F.3d at 546.

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions.  *See id*. at *2-*3.  The Regulations explain, "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b).  To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(e), including, at a minimum, the factors of supportability, consistency, and specialization.  *See* 20 C.F.R. § 404.1572(e); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

### C.    <u>Analysis</u>

The ALJ recited the correct legal criteria applicable to weighing the opinions of a

treating physician.  (*PageID#* 90).  The issue, thus, is whether the ALJ actually applied the correct legal criteria to the evaluation of the medical source opinions and whether substantial evidence supports the ALJ's evaluation.

In rejecting Dr. Goldstick's opinion, the ALJ relied on the opinion of Dr. Goren, the nonexamining medical expert who testified at the hearing.  (*PageID#* 89).  The ALJ believed that Plaintiff's description of her activities suggest that she is capable of a greater degree of physical and mental activity than Dr. Goldstick suggests.  (*PageID#* 91).  Dr. Goldstick himself conceded that he based his opinion, at least in part, on her subjective symptoms, and that exams at times have been within normal range.  (*Id.*).  The ALJ concluded, "[i]n terms of supportability and consistency with the overall record, the pessimistic opinions of Dr. Goldstick do not fare very well and are given no controlling or deferential weight, that is, they are given little weight."  (*Id.*).  As explained below, the ALJ's rejection of Dr. Goldstick's assessment of Plaintiff's functioning is without substantial support in the record.

First, the problem with Dr. Goren's opinion – and by extension the ALJ's decision which relies on such testimony – is that Dr. Goren's testimony ignores the relapsing nature of multiple sclerosis and the progress and course of this disease, as recognized by Sixth Circuit precedent.  Courts have long recognized that multiple sclerosis is a progressive disease for which there is no cure, and which is subject to periods of remission and exacerbation.  *See Parish* v. *Califano*, 642 F.2d 188, 193 (6th Cir. 1981); *see also Wilcox* v. *Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990).  While multiple sclerosis

is not itself per se disabling, the ALJ, in evaluating a claimant with multiple sclerosis, must consider "the frequency and duration of the exacerbations, the length of the remissions, and the evidence of any permanent disabilities." *Wilcox,* 917 F .2d at 277. The Social Security regulations likewise recognize that "[i]n conditions which are episodic in character, such as multiple sclerosis . . . consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. I, § 11.00(D)(emphasis added). "[W]hen a claimant with multiple sclerosis applies for social security benefits, it is error to focus on periods of remission from the disease to determine whether the claimant has the ability to engage in substantial gainful employment." *Jones* v. *Sec'y of Health & Human Servs.,* 35 F.3d 566 (6th Cir. 1994) (unpublished), 1994 W.L. 468033, **3, citing *Wilcox,* 917 F.2d at 278; *Parish,* 642 F.2d at 193. The ALJ provided great weight to the testimony of Dr. Goren, "based on his expertise in neurology and because he supported his assessment with an accurate analysis of the medical records, including due consideration to the opinions of treating sources." (*PageID#* 89). The ALJ also agreed that Dr. Goren "pointed out that the objective findings underlying Plaintiff's MS symptoms were not strong and did not support the rather dire functional evaluations of physicians such as Dr. Goldstick and Dr. Vyas." (*Id.*)

The ALJ fully credited the opinions provided by Dr. Goren because of his specialization as a neurologist – a proper consideration under the Regulations. *See* 20

C.F.R. §404.1527(d)(5).  Dr. Goren, however, provided no meaningful explanation of his opinions, but rather gave little more than conclusory statements.  For example, Dr. Goren testified that Plaintiff's conditions did not meet certain Listing-level impairments, yet he failed to explain how he formed this opinion.  Furthermore, Dr. Goren specifically criticized the treating physician's opinions as "conclusory," (*PageID##* 141, 144), yet he, himself, failed to explain this very opinion any further.  (*PageID#* 142).  When Dr. Goren was asked what about the treating physician's "physical findings are missing to make it consistent with the opinions," Dr. Goren never answered the question.  He never provided examples of what "physical findings" he believed to be lacking in the treating source opinions.  Dr. Goren testified to treating "hundreds" of patient's suffering from multiple sclerosis, yet failed to consider the relapsing and remitting nature of this disease with regard to Plaintiff.  Thus, the ALJ's reliance on Dr. Goren's opinion was in error.  This is particularly troublesome considering Dr. Goren is a neurologist who has a lengthy history of testifying during social security hearings.

Second, the ALJ's conclusions that "the objective medical findings do not support the degree of functional limitation that Dr. Goldstick has proposed," (*PageID#* 91), are without substantial support in the record.

The MRI evidence provides objective support for Dr. Goldstick's diagnosis of multiple sclerosis and the relapsing and remitting nature of such an illness.  As noted above, Plaintiff was first diagnosed in June 2004.  By January 2007, she had presented to the Cleveland Clinic where MRI's of the Plaintiff's brain showed an increase in the

number of lesions when compared to MRI's taken in February 2005 and February 2006. (*PageID##* 356-57).  An MRI taken of Plaintiff's brain on August 23, 2007, revealed 12 to 14 bilateral lesions, primarily in gray-white matter junction.  (*PageID#* 386).  An MRI of the brain from July 28, 2008 showed a "slight increase in the number of lesions," since the August 23, 2007 study.  (*PageID#* 775).  Plaintiff's symptoms of pain, fatigue, weakness, and instability are well documented in Dr. Goldstick's records and reports, as well as the other medical records for the pertinent time period.  They are also fully consistent with Plaintiff's diagnosis of multiple sclerosis.  *See Young v. Apfel*, 221 F.3d 1065, 1067 n. 3 (8th Cir. 2000) (noting symptoms of multiple sclerosis "include muscle weakness, numbness, fatigue, loss of balance, pain, and loss of bowel and bladder control"); *accord Clark v. Barnhart*, 64 Fed. Appx. 688, 691 (10th Cir. 2003).

Under the Regulations and case law, it was not enough for the ALJ to single out two factors – specialization and lengthy history of testifying – as a basis for crediting Dr. Goren's opinions, without also considering his opinions under the regulatory factors that detracted from his opinions, such as "supportability" and "consistency."  *See* 20 C.F.R. § 404.1527(d)(3)-(4); cf. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *cf. also Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Kuleszo v. Barnhart*, 232 F.Supp.2d 44, 57 (S.D.N.Y. 2002). The Regulations and Rulings, moreover, required the ALJ to weigh Dr. Goren's opinions under the same regulatory factors that are applicable to treating medical source opinions.  *See* 20 C.F.R. §

404.1527(e); *see also* Social Security Ruling 96-6p, 1996 WL 374180.  The ALJ erred by failing to do so in the present case.

In addition, the ALJ erred by not continuing to weigh Dr. Goldstick's opinions under the remaining factors of the Regulations.  *See PageID#* 89.  Even though the ALJ identified the continued-weighing requirement, he did not frame his evaluation in terms sufficient to explain what regulatory factor led him to ultimately decide to reject Dr. Goldstick's opinions.  In addition, if the ALJ's explanation could be read as applying the continued-weighing requirement, substantial evidence does not support his findings.  The ALJ wrote, "Dr. Goldstick's opinions of Plaintiff's ability to work has evolved over time to coincide with her own perception of her work capabilities." (*PageID#* 91).  Yet a review of Dr. Goldstick's treatment notes and opinions reveal that his notes from March 2007, as well as September and November 2007, discuss Plaintiff's attempts to work prior to her filing for disability, and not an inconsistency in Dr. Goldstick's opinions. (*PageID##* 405, 730-31, 744)

Dr. Goldstick's opinion is also consistent with other physician provided evidence of record.  For example, Plaintiff's treating internist, Dr. Vyas, noted in May 2008 that Plaintiff could not do her factory job and that any gainful sedentary job would be difficult to perform.  (*PageID##* 435-36).  In May 2010, Dr. Vyas opined that Plaintiff could not do any gainful job considering her combined impairments.  (*PageID#* 993).  Dr. Vyas treated Plaintiff since 1995.  (*PageID#* 435).

In April 2010, Plaintiff's treating psychiatrist, Dr. Dueno, reported that many of Plaintiff's mental abilities were seriously impaired, including her ability to deal with stress, maintain attention, achieve time limits, and keep a work schedule.  Dr. Dueno opined that Plaintiff is struggling with her inability to perform or function as she once did, and this was a "big blow" to her self esteem.  (*PageID##* 982-85).

While there remains the possibility that the ALJ's errors were harmless, a review of Dr. Goldstick's opinions does not reveal they were "so patently deficient that the Commissioner could not possibly credit [them] . . . ." *Wilson*, 378 F.3d at 547.

Accordingly, Plaintiff's contention that the ALJ erred by rejecting the opinions of her treating physician, and instead relying on the opinion of Dr. Goren, is well taken[8].

## VI.    AWARD OF BENEFITS IS WARRANTED

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of*

---

[8]In light of the above review, further analysis of Plaintiff's remaining contentions is unwarranted at this time.

*Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

An Order remanding for payment of benefits is only warranted "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher*, 17 F.3d at 176.  The Court finds a judicial award of benefits is warranted in the present case because the evidence supporting the existence of Plaintiff's disability is strong while contrary evidence is lacking.  The strong evidence consists of the opinions provided by Dr. Goldstick, as well as evidence contained in the longitudinal medical record.

Dr. Goldstick, a neurologist, has been treating Plaintiff since March 2007.  He based his initial diagnosis on objective data from brain MRI's performed in 2005 and 2006, which indicated an increase in the number of white matter lesions, as well as upon consideration of Plaintiff's episodes of neurological dysfunction.  Additional MRI's subsequently performed further support Dr. Goldstick's conclusions.  Since January 2008, Dr. Goldstick has repeatedly concluded that Plaintiff is unable to perform full-time competitive work due to symptoms of multiple sclerosis.  (*PageID##* 339-40, 426, 951-56, 987-992).  His opinions are also consistent with the opinions of other treating sources, specifically, Drs. Dueno and Vyas.  For example, Plaintiff's treating psychiatrist, Dr. Dueno, found that Plaintiff had a severe impairment in her ability to perform many work-related functions.  (*PageID##* 982-85).  Dr. Dueno specifically noted that "M.S. is a chronic, debilitating disease and I suspect [Plaintiff's] depression will continue along with her neurological deficits."  (*PageID#* 984).  Dr. Dueno also noted that his prognosis of

28

Plaintiff's condition – major depression due to neurological condition (multiple sclerosis) – is "guarded," and that her impairment is expected to last for 12 months or longer. (*PageID#* 984-85).  Likewise, Dr. Vyas, Plaintiff's treating primary care physician since 1995, stated on May 12, 2010, that Plaintiff's "medical conditions prohibit her from maintaining any gainful job."  (*PageID#* 993).

The administrative record, moreover, does not contain a report by a treating or examining physician who believes that, despite her impairments, Plaintiff has the residual functional capacity for light work, or for the restricted range of light work set by the ALJ in his assessment of Plaintiff's RFC.  Consequently, "all essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher*, 17 F.3d at 176; *see Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990).

As discussed above, based on the assessments of treating neurologist, Dr. Goldstick, the record indicates Plaintiff does not have the capacity for even sedentary work.  As such, all substantial factual issues have been resolved and the record reflects that Plaintiff has been disabled since August 13, 2007.[9]

### IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's non-disability finding be vacated;

---

[9] Social Security Ruling 83-20 provides that when impairments are progressive in nature, the Commissioner must "infer the onset date from the medical and other evidence that describes the history and symptomology of the disease process." *See also Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

2.        Plaintiff's case be **REMANDED** to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for payment of DIB and SSI consistent with the Social Security Act; and

3.        The case be terminated on the docket of this Court.

November 19, 2013

                                    s/Sharon L. Ovington

                                    Sharon L. Ovington
                        Chief United States Magistrate Judge

30

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).